**BOWLES, Adm'r, Office of Price Administration, v. BRANNAGAN.**

**Civil Action No. 47.**

District Court, D. Nebraska,
Hastings Division.

June 16, 1945.

Bert L. Overcash, and Dwight W. Dahlman, both of North Platte, Neb., for plaintiff.

C. M. Pierson, of Lincoln, Neb., for defendant.

DELEHANT, District Judge.

For the defendant's alleged sale, on or about June 6, 1944, to Nebraska State Hospital for the Insane, a state institution, at Ingleside, Nebraska, of one hundred eleven bushels, fifty-seven pounds, of number two yellow ear corn for a price $1.67 in excess of the maximum allowable price therefor, under Second Revised Maximum Price Regulation 346, as amended, issued under the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A. Appendix § 901 et seq., the plaintiff sued under 50 U.S.C.A. Appendix § 925(e) to recover a judgment for fifty dollars and costs of suit. Upon the trial, admitting that the alleged violation was "neither wilfull nor the result of failure to take practicable precautions against the occurrence of the violation", 50 U.S.C.A.Appendix § 925(e), the plaintiff conceded that his maximum potential recovery was twenty-five dollars. The defendant denied his violation of the maximum price provision of the Regulation. The case has been tried to the court without a jury upon its merits.

The court now sets forth the facts proved upon the trial, noting the only instance in which there was any question even of the adequacy of proof.

The defendant was and is a farmer, residing now, and at the time in question, upon a farm owned by him and located eight and three-fourths miles south westerly from Hastings, Nebraska, and about seven miles southerly from the hospital. Early in June 1944, he was continuously in Lincoln, Nebraska, for a considerable period of time, undergoing a series of dental treatments. During his absence from his farm home on that mission, one William W. Maltman, the steward of the hospital, being in need of corn for immediate use at the institution, without any knowledge by, or notice to, the defendant, made an agreement with the defendant's brother, also a farmer, for the purchase from the latter of some ear corn in a crib on the brother's farm, in the general neighborhood of, but some distance from, the defendant's farm residence. Promptly thereupon, Maltman sent some workmen from the institution to

get the corn, for whose purchase he had arranged. Confusedly they went not to the farm of the seller but to that of the defendant, and there, over the protest of his daughter, removed from his crib and took to the institution the quantity of corn involved, being all the corn the defendant then had. The daughter's protest is the only fact in the case which the plaintiff questions, and, in respect of it, he states in his brief that there is no competent evidence of the protest. However, Maltman, while testifying as a witness for the plaintiff stated without objection that she did make such a protest. So, disregarding like testimony which was given by the defendant in his own behalf, it appears that the plaintiff himself introduced evidence of the protest. To be sure, the evidence of the protest on both sides was hearsay. But upon the trial no factual issue arose over the making of the protest and both parties seemed disposed to establish it. In that situation, the court finds that the protest was made though it is no more than an immaterial circumstance of a fairly common pattern with the other facts in the irregular procurement of the corn. Once at the institution, the corn was was promptly ground and consumed, for the need of it had been urgent. The defendant, too, stood in sore need of the corn for livestock feed. He had not intended, and was never willing, to sell it, and, in fact, had not sold any of his corn for eight years, but had always fed it on his farm.

His dental treatment completed, the defendant returned to his farm and learned from his daughter that his corn had been taken by workmen for the institution. At his convenience, and in a few days (June is a busy month on southern Nebraska farms), he went to the institution and inquired, about the taking of his corn, of Maltman, who informed him that it had then been ground, and consumed by the hospital's livestock. Though irritated by the incident, the defendant recognized that it was not deliberate, but quite inadvertent, and stated to Maltman that if he, Maltman, were resolved to take without permission any of the defendant's grain, it would have been much more convenient if he had taken a quantity of oats that was located on another farm quite near the hospital on which the defendant had shortly theretofore resided; and that the defendant would have to move the oats to his residence though he could replace it by the purchase

of oats much nearer his home, whereas the corn had been stored precisely where it was needed and would have been used. To which, Maltman replied that the institution also needed oats and he would be pleased to send workmen to get the defendant's oats and to pay for them upon the basis of their weight and the market price current when they should be gotten. Neither party to the conversation then knew the precise weight of the oats, and though in the conversation Maltman told the defendant that the corn had been weighed upon its acquisition, he did not tell the defendant, and at the time of the conversation neither party to it knew, the precise weight of the corn.

The conversation resulted in an agreement by the defendant to settle the transaction regarding the corn upon the basis of the regulated ceiling price for the exact weight of corn taken, and to sell the oats to the institution upon the basis of their weight and market price at the time of delivery, which the institution was to accept in the bin. To facilitate and expedite payment and eliminate unnecessary travel, the defendant then signed, at Maltman's request, a single completely blank voucher form for presentation through the state's appropriate auditing channels, with the understanding that Maltman would finish it by inserting, upon his acquisition of the required information, the description of the corn with its weight and price at the prevailing ceiling price, which Maltman was to ascertain and neither party then knew with certainty, and of the oats with their weight and price at the prevailing market price.

That was the last the defendant did or heard about the matter until he received through the mail some weeks later a check from the State Treasurer of Nebraska for $243.24 without itemization or analysis of the units represented by it or any other comment. Assuming it to be for the correct amount, and the check being in fact for substantially the correct amount, he accepted it and converted it into cash.

Maltman, meanwhile, had caused the oats to be gotten and weighed and had correctly ascertained the market price thereof. In the utmost good faith, he undertook to ascertain the ceiling price for the corn, but instead of seeking that information at the local War Price and Rationing Board, went to the local federal AAA board offices to obtain it. There he observed on a bul-

letin board a statement that the ceiling price of such corn per bushel was $1.015, regardless of where the corn was grown. Actually, with adjustments, the ceiling price for shelled corn was $1 per bushel; and this, according to the regulation and a stipulation of the parties upon the trial, was subject to a further reduction in the sum of two cents per bushel by reason of the fact that the corn was taken in the ear. So, the amount received by the defendant was about $3.91 (not $1.67, as pleaded) above the allowable maximum price for such corn. But the defendant was wholly unaware, not only of the error, but even of the precise payment he had received for the taking of his corn, since the payment for the oats was included with it in the single check.

■ The defendant's first intimation of the error came to him through a letter from the North Platte, Nebraska, office of the plaintiff dated October 20, 1944, demanding the payment of a statutory penalty for his asserted violation of the Regulation. Quite promptly, he replied, setting out the facts essentially, though not as fully or clearly, as they have been recited here, and asserting his innocence, and complete want of knowledge of the price he had been paid for the taking of his corn, and signifying his willingness to reimburse the state for the claimed overcharge which he then attempted· unsuccessfully to do. Of course, if a violation of the Regulation had occurred, the offer and attempt to restore the overcharge would not have purged the defendant of his guilt and liability. Beasley v. Gottlieb, 132 N. J.L. 603, 42 A.2d 305; Zwang v. A. & P. Food Stores, 181 Misc. 375, 46 N.Y.S.2d 747. The explanation and offer were rejected and this suit followed.

Precisely what was the legal character of the transaction? With substantial reason, the defendant argues that it was not a sale. Recourse must be had primarily to the statute under which the action is brought for the definition of material terms. 50 U.S.C.A.Appendix § 942, so far as it is material provides: "As used in this Act—(a) The term 'sale' includes sales, dispositions, exchanges, leases, and other transfers, and contracts and offers to do any of the foregoing. The terms 'sell', 'selling', 'seller', 'buy', and 'buyer', shall be construed accordingly. (b) the term 'price' means the consideration demanded or received in connection with the sale of a commodity. (c) The term 'commodity' means commodities, articles, products, and materials * * *."

■ It may be granted that, in application to the singular and essentially admitted factual situation before the court, these definitions are not obviously and clearly instructive. They do, however, lead to the conclusion that the Act, and its implementing regulation, are aimed at (1) a sale, disposition, exchange or transfer, (2) for a forbidden price (3) of a commodity. Even within the sweeping reach of this statutory definition, the existence of a "thing" susceptible of sale is an indispensable condition to the occurrence of a sale. And invariably to the same effect are the judicial decisions and textual definitions upon the point. Butler v. Thomson, 92 U. S. 412, 414, 415, 23 L.Ed. 684, quoting Blackstone, Kent, Benjamin and Atkinson; Ratigan v. United States, 9 Cir., 88 F.2d 919, 921, certiorari denied 301 U.S. 705, 57 S.Ct. 938, 81 L.Ed. 1359, rehearing denied 302 U.S. 774, 58 S.Ct. 52, 82 L.Ed. 600; City of Iola v. Lederer, 86 Kan. 347, 120 P. 354, 356; Burkhardt v. Decker, 221 Mo. App. 1066, 295 S.W. 838, 840; Logan v. Stephens County, Tex.Civ.App., 81 S.W. 109, 110; Heroy v. Reilly, 84 N.J. 671, 87 A. 112, 114, in which the court distinguishing between a "sale" and a "relinquishment", says quite significantly: "A sale involves a transfer of something that may still exist after the transfer"; 23 R.C.L. 1243, Title, "Sales", Section 61; 55 C.J. 62, Title, "Sales", § 24.

Now, when the defendant first discovered the removal of his corn, and unquestionably, when he approached Maltman about its taking, no salable commodity remained in existence. The defendant did not then own any corn which he could sell to the state of Nebraska or anyone else. Nor was there any corn which he could replevin or otherwise recapture.

■ He did, indeed, own something in respect of which he might negotiate. However, it was not corn or any other commodity, but rather a chose in action against the institution or the individuals acting for it, or both, for the wrongful, though formally innocent, trespass upon his property and conversion and complete destruction of his corn. In Nebraska it has been determined that a taking and destruction of chattel property, after the fashion of the institution's action, constitute a conversion of the property, even though the taker acts in good faith. Stough v. Stefani, 19 Neb. 468, 470, 27 N.

W. 445; Hill v. Campbell Commission Co., 54 Neb. 59, 62, 74 N.W. 388. The conversion having already become complete and irretraceable, all that remained to the defendant was his claim for damages on its account.

So, when he had finished his discussion and arrived at the measure of his reimbursement, irrespective of the language in which the negotiations may have proceeded, all the defendant had done, or could have done so far as the corn transaction extended, was to accomplish a settlement of his claim against those who had taken it. The court, therefore, holds that there was never a sale of the corn by the defendant.

The court is willing to reach that conclusion the more readily in consequence of the complete absence of subterfuge in the transaction, and of the sincere and honest attempt of the defendant to conform to the letter and spirit of the Act and Regulation, whether he was or was not within its operation. He was willing to accept in settlement of his claim the ceiling price of the corn that had been taken, though the taking had both deprived him of corn that he needed and subjected him to the expense of transporting to his farm grain to replace it, acquired elsewhere. With no small measure of propriety the latter element might very well have entered into the reimbursement for his loss.

The plaintiff offers the argument that the agreement upon a price in this instance ratified the earlier wrongful taking, and thus resulted in a sale. If, when the negotiations occurred, the corn had been in existence, with the consequence that the defendant might at his election have demanded its return or consented, for a price, to its retention, the argument might, and probably would, have been valid. But here no choice remained to the defendant. He had no alternatives between which he might elect. The only question before him was what he should be paid for the wrong he had suffered. Agreement on that question was not operative to constitute a sale of anything, certainly not of a thing that then had no being, either actual or potential, and was not legally the subject of a sale.

Even if the court were persuaded that a sale resulted, in legal contemplation, from the transaction, grave doubt would remain about the plaintiff's right to recover, in the face of the defendant's admitted agreement to accept only the ceiling price per bushel in respect of the corn; his direction that so far as concerned the taking of his corn such amount only be inserted in the voucher, a manifest limitation upon Maltman's authority in its completion; his reasonable supposition that the check of the state treasurer was for the agreed and lawful amount under circumstances that were not at all calculated either to warn him to the contrary or to put him upon inquiry or notice. To be sure, it is not requisite to liability that a seller intend to violate, or know that he is violating, a regulation. But the consequence of violation being highly penal, it would not seem to be unreasonable that the status of a violator should not be affirmed of one who is wholly unconscious of the price he has received, and has no reason whatsoever to suppose that he has been paid more than the lawful price for which he agreed. That problem however, being unnecessary to the decision, is not passed upon.

It would seem that a final, though perhaps gratuitous, comment is in order. The completed voucher and the endorsed check of the state treasurer, divorced from their now admitted factual context, warranted the institution of this cause. It was made clear on the trial that their unusual surroundings were not brought home with certainty to the plaintiff until the case was ready for submission to the court.

Judgment of dismissal is being entered. Exception is allowed the plaintiff.