Ross Produce Company, Appellee, v. C. C. Thompson et al., Appellants.

No. 46733.

October 16, 1945.

Parrish, Guthrie, Colflesh & O'Brien, of Des Moines, and Valentine & Valentine, of Centerville, for appellants.

George A. Milani, of Centerville, and Wayne Norman, of Unionville, Missouri, for appellee.

Bliss, J.— On March 20, 1944, plaintiff's Chevrolet truck, loaded with crates of live poultry and driven by its employee, was proceeding south on graveled highway No. 60. At about 7:30 o'clock in the evening, and about two and a half

miles north of Cincinnati, Iowa, and just after crossing a bridge, the truck collided with the coupé, which was traveling north. In approaching the bridge from the north, the truck had descended a hill with about a six per cent grade. And in traveling north the coupé had descended a hill which leveled off as it reached the bridge. Each driver saw the other a considerable distance from the bridge. The bridge was one hundred twenty feet long, with a roadway eighteen feet eight inches wide. The driver of the truck testified: That he approached the bridge at a speed of about thirty miles an hour, which he lessened as he was about to cross; the coupé was approaching at a speed of about thirty-five miles an hour, which was not decreased; as the truck crossed the bridge on the right-hand side, and the front end of the truck was eighteen or twenty feet beyond the south end of the bridge, and on the right or west side of the road, the coupé swerved over the center line of the road two and a half to three feet and onto its west side, causing the fender over and back of the left rear wheel of the coupé to strike the front wheels or body of the truck; these wheels came off and the rest of the truck went forward on the west half of the road about thirty feet and turned over in the road and threw the crates of poultry to the west into the ditch; it was forty-eight or fifty feet from where the truck stopped to the south end of the bridge; the distance between the guard-rails at the south end of the bridge and the width of the road at that place was about twenty-seven feet; after the collision the driver of the truck went back where Thompson was standing near the coupé, which was upright and facing to the north-west, with its left front wheel about two and a half feet east of the center line of the road, and with its left rear wheel about three and a half feet east of that line; the coupé was about eighteen or twenty feet from the south end of the bridge; there were two marks cut into the highway on the west half of the roadway, which extended from the point of collision up to where the truck stopped; one of these marks was about one foot from the center of the highway.

Another witness for plaintiff, who was in the business of buying wrecked motor vehicles, was at the scene of the collision early the following morning. He testified to seeing the tracks

865

made on the west side of the road by the truck when it struck the ground after its front wheels were knocked from under it. He saw where the front wheels went from under the truck. The coupé and wreckage of the truck had been moved to clear the road before this witness arrived. The marks which he described as being in the west half of the roadway, as he said, "could have been made by the frame or the motor: The whole thing was drug on the ground because the front axle and all went out from under it. There were more than one track on the ground." These tracks were on the west side of the highway and ran away from the place of the collision or accident. This witness also testified that two trucks could pass on the bridge at the same time, as he had been in one of the trucks at such time. The county engineer of Appanoose county testified to the measurements of the bridge and roadway as above given, and said that he "would call it a two-way bridge."

The defendant Thompson, who was the manager of the defendant company at the time of the collision, and was driving the coupé, testified: That he saw the truck when it was about twelve hundred feet distant, approaching at a speed of approximately fifty miles an hour, as it was coming down a little hill and gaining momentum; that the truck was very wide and he was a little afraid to go on the bridge, "and so I pulled to the right hand side [the east side] of the road and the fender was against the guard rails, which are wire rails and, of course, the back end was out a little, but it was not out to the center of the road. I was on my side of the road—very much so. * * * My car was about ten feet south of the bridge at the time of the accident. * * * The whole car was away from the center line. * * * I was hit on the left hand rear fender as it comes down to join the running board by the left hand side of the bottom of the truck * * * The impact sprung the door and dented the back end of the fender and body badly and bent the differential in the back axle and turned the car around and set it over about ten feet from where it was. As a result of the accident, I was thrown about twenty feet from the car. The first thing after I got up, I picked up Mrs. Elgin [who was riding with him] and got her in the car." He testified that the truck "just fell all to pieces."

Mrs. Elgin testified in substance:

"We were probably two hundred feet south of the bridge, when I first saw the truck probably a quarter of a mile away on the opposite side, coming at least sixty miles an hour in my opinion; I followed it with my eyes from the time I first saw it, practically all the way until it reached the bridge; I noticed no change in its speed; we were driving about thirty miles an hour and were about two hundred feet from the bridge when I first saw the truck; just prior to the collision, Mr. Thompson pulled off to the right side of the road and came to a full stop about *fifty feet* from the south end of the bridge, to the right of the center of the highway probably about four feet from the center; I glanced up as we stopped and saw them come upon the bridge and the next second they hit us; after it stopped our car was facing east; I was thrown over the steering wheel and went out of the door as it came east, and Mr. Thompson was thrown out of the car on the opposite or the west side of the road."

The foregoing statement fairly sets out the contentions of each side, gathered from the evidence, as to how the collision occurred. The general plant superintendent of the defendant company was a witness for it and testified that he was at the scene of the collision about 8:30 o'clock the same night; and "examined the road on the east side of the south end of the bridge and saw a set of tracks pulled into the guard rail on an angle. I would say less than a forty-five degree angle from the center of the traveled portion of the road. There were two tracks, the east one of which was a foot or eighteen inches from the guard rail." He did not give the location of the coupé as he found it that night, but said he saw the front wheels of the truck about fifty feet south of the bridge and detached from the chassis of the truck, which was still farther south.

I. Appellants assign as their first error relied upon for reversal the failure of the court to sustain their motions for a directed verdict and for judgment notwithstanding the verdict, upon the ground that the physical facts are conclusive that the collision could not have occurred as appellee contends

and sought to prove. Their argument is that if the testimony of the appellee is true, the coupé "would have plunged forward * * * through the rails, into the bridge or into the river," and that since it did not, the testimony of appellee must be rejected and be held to be unbelievable, as a matter of law. We cannot agree with the conclusion of appellants. The position of the colliding vehicles immediately after the collision cannot be accepted as conclusively establishing the truth of the testimony offered in behalf of the appellants or the falsity or inaccuracy of that given for the appellee. Under the record presented to this court the issues of fact were for the determination of the jury. There is no necessity of citing nor discussing the decisions of this court relied upon by appellants with respect to the "physical fact rule," as neither the rule nor the decisions is applicable or controls in the determination of any question before us.

II. Appellants' second and last assigned error is based upon the refusal of the court to hold that the measure of damages for the damage to the truck was *not* the fair and reasonable market value of the truck immediately before the collision but was the OPA (Office of Price Administration) ceiling price of the truck, as determined by the Emergency Price Control Act of 1942, as amended, 50 U. S. C. App., Supp. V, section 901 et seq., and in failing to so instruct the jury, as requested by appellants.

The evidence establishes beyond any question that the truck was damaged beyond repair, and was so demolished that it had no value except such as might be salvaged from the remnants. A competent witness testified as follows:

"Q. What would you say was the fair and reasonable market value on the 20th day of March, 1944, before the accident? Mr. Parrish: Objected to as the witness not shown himself and not the proper measure of damages. The Court: You raised two questions, that it is not the proper measure of damages, and the witness not showing himself qualified or is he not qualified to state? Mr. Parrish: He is not qualified to state from his own statement as to what the value of the truck was. The Court: I think the witness may answer. Overruled. A.

I would say around in the neighborhood of thirteen hundred dollars, the sale value of the truck at that time. The salvage value of the truck in the condition it was would bring about $100.00."

The above testimony was not disputed except by the testimony set out below of a competent witness of the appellants, to wit:

"The particular truck in question in February, 1940, [when appellee procured it on a trade-in] would have sold for approximately $1,300.00. * * * Q. Could you state what would have been the reasonable market value of that truck as of March 20, 1944? A. Of course that is governed by the OPA regulation. I could give you the exact price that it would figure out by the OPA regulation, and that is supposed to be the market value of them. Q. Will you give us that? Mr. Milani: Object to the question as being incompetent, immaterial and irrelevant, and that the OPA regulation does not fix or establish the fair and reasonable market value of the truck in question. The Court: The objection will be overruled. The court understands there is an OPA ceiling on trucks, is that correct, Mr. Mishler [the witness]? A. That's right, an OPA ceiling. That would figure $634.55. Q. Is that the figure that you would be allowed to sell a truck for to a retailer, or to a consumer? A. No. That is the figure that an individual can sell the truck either to another individual or to a dealer. A dealer is allowed fifteen per cent more than that, provided they guarantee the truck by the OPA standard guaranty. * * * [Cross-examination.] Q. As you understand the OPA ceiling price, that does not absolutely fix the market value of the truck? A. It does so far as dealer sales are concerned. * * * Q. The mere fact that there is an OPA ceiling price, that does not change the value that a truck may have? A. Well, of course, there might be a question about that. The value we consider is what they will sell for. Q. Does that mean that that is the fixed value that anybody has on a truck is what the OPA says it is? A. That's right. That is the fixed ceiling that it can be sold for. In other words, it cannot be sold higher than that legally. If it is sold higher illegally the person is subject to a fine or treble damages. Q. Do you

mean to say that a truck that you say sold for approximately thirteen hundred dollars, because the OPA says it is only worth $634.55, that that is the actual value of it? A. That is what the OPA says. * * * Q. Do you know what it would cost to replace a truck like this? Are you selling any trucks? A. Whenever we find—trucks are scarce. It is hard to find a truck, more than anything else now. * * * Q. Can you replace a truck like this for that much money today? A. I don't have any trucks. * * * I couldn't today. I don't have any.''

The witness also testified that the OPA ceiling price of $634.55 covered only the chassis, cab, and tires, and did not include the box and any accessories attached to the truck.

The examination of the witness sets out quite fully the theories and contentions of the litigants.

In its Instruction No. 10, the court, among other things, said:

''Plaintiff claims that its truck was damaged beyond repair, and if you so find, you should allow plaintiff the fair and reasonable market value of the truck immediately preceding the accident, less its salvage value * * * not to exceed the amount of $1,200.00, the amount claimed therefor.''

Appellants had requested an instruction that the fair and reasonable market value of the truck just preceding the collision was $534.55, being the OPA ceiling price, less the $100 salvage value. This instruction was refused. The jury returned a verdict against appellants for $1,517, which amount included the loss of poultry, chicken coops, a tarpaulin, and other necessary expenses.

Appellants raised the error complained about by motions to direct and for judgment non obstante veredicto, which were denied.

We find no error in the rulings of the court. The question involved in this assignment of error is before the court for the first time. Appellee bases its argument on the proposition that under the provisions of the Emergency Price Control Act of 1942, as amended, the OPA ceiling price on the truck does not determine its market value, since there was no sale

or contemplated sale of the truck. It cites no decisions bearing directly on the question.

Appellants cite one decision, Dennis Cunningham v. National Guild Insurance Company, of the Peoples Court of Baltimore, Maryland, 10019–42. The action was on a fire-and-theft policy against an insurer, arising from the theft of an automobile. When plaintiff's stolen car was recovered the spare wheel, tire, and tube were missing. Plaintiff claimed that a tire and tube equal to those stolen would cost him $15 and $5, respectively. The court, in allowing the ceiling prices of $8.10 and $1.50 for the used tire and tube, said:

"There being no lawful free market as regards tires and tubes, I believe that the plaintiff's measure of damage is the highest price in the controlled market. It seems to me to be against public policy that a price or value arrived at through the operation of a 'black market', which price in itself is unlawful, should be used as a measure of damage in a court of justice."

The decision and reasoning of the court are not persuasive. They appear to us to disregard the insurer's contract obligation to compensate the insured in money or by replacement of articles as good as those lost, and the court also misconceives the purpose of the Emergency Price Control Act of 1942, as amended. As said, in numerous decisions construing the act, "the paramount aim of price control legislation is to protect the nation's economic structure against inflation in the interests of national security and defense." Bowles, Admr. v. Texas Liquor Control Board, March 23, 1945, 5 Cir., Tex., 148 F. 2d 265, 266. Its purpose is to place a ceiling limit on prices in "sales" of commodities, services, etc., or transactions reasonably within the scope of the term "sales." It was intended to prevent the unrestricted and uncontrolled delivery or disposal of these commodities, etc., at the highest prices obtainable. Surely it was never enacted to place a ceiling upon recoveries for property losses under insurance policies, or for recoveries for injury to or destruction of property by tort-feasors or other wrongdoers, and thus serve to relieve them of making just compensation for injuries caused by their wrongdoing. These adjustments could never be a serious factor in the battle against inflation.

The matter between the parties resulting from the collision of the vehicles is not a voluntary sale of the truck or any other transaction within the purview of the act but it is a claim for damages of appellee against appellants for their negligent destruction of its property. It is a chose in action. Before the collision appellee had a truck which was used in its business. It was not for sale. It was almost irreplaceable, as this record shows. Its money value to it was not determined by the "black market," but by the law of supply and demand, the controlling factor, ordinarily, in the maintenance of market values. After the collision it had made no sale and had received no price and had nothing to sell. The measure of damages given to the jury by the court was the correct standard by which to measure the reparation owing by appellants to the appellee.

We have found no automobile-collision case in which the question before us has arisen but decisions in analogous cases clearly point the way to a correct determination.

In Tierney v. General Exchange Ins. Corp., 60 F. Supp. 331, 332, decided May 8, 1945, by the United States District Court of the Northern District of Texas, Dallas Division, affirmed 152 F. 2d 224, suit was brought by the plaintiff to recover on an automobile fire-insurance policy. The automobile was purchased for $3,384, which amount was stated in the policy. In rendering judgment for the plaintiff in the above-stated amount, the court said:

"On July 10, 1944, the OPA promulgated regulations affecting the 'sale' and 'delivery' of used cars on a certain 1942 basis.

"The automobile, while in excellent condition, was destroyed by fire on August 15, 1944. The OPA regulations fixed the ceiling price of such a car at $1600 without warranty, or, $2,000 with warranty.

"The defendant contends that the plaintiff cannot recover an amount in excess of such fixed price.

"The policy gives the defendant the right to require the insured to accept replacement. No such offer was made.

"There is no provision in the policy which would denominate it a valued contract. There is a provision which pro-

vides that the defendant shall be liable to the insured for the value of the property at the time of its loss.

"The interesting question, therefore, is, Did the fixing of the ceiling price by the Administrator for one who deals in, or sells used automobiles, fix the value of the car?

"We must bear in mind that the War Powers Act, 50 U. S. C. A. Appendix, §631 et seq., was for the purpose of curbing, lessening and preventing inflation, so far as legislation could or can accomplish that end. In order to make regulations under it legally effective, it was necessary that they should be sufficiently specific to cover the transactions at which they were aimed. The particular schedules pertinent to this study concern the 'sale, or, delivery' of used cars. There is no apparent reasonable stretch of the regulations which would cover an 'adjustment for insurance' losses. In truth, there is a phrase in the regulations which excepts such efforts from the regulation. Nor is there anything in the Act or regulations which compels the owner of property to dispose of it. The owner who has paid for an automobile and who does not see fit to 'sell' that automobile, or to 'deal' in it, ought not to be classified as a 'seller' or a 'dealer' if and when he seeks pay from an insurance company which has collected a premium from him and agreed to pay him for the fire loss of his property. Such an event does not classify him as either a 'seller' or a 'dealer.' He has not been identified in any of the regulations under the Act, and seems to have been excepted from their operation."

In Bowles, Admr. v. Brannagan, 60 F. Supp. 897, 898, 900, decided June 16, 1945, by the United States District Court of Nebraska, Hastings Division, suit was brought to recover penalty for sale of corn over the OPA ceiling price. The facts are, briefly, these: While defendant was absent from his farm for some time having dental work done, the steward of a State Insane Hospital, being in urgent need of corn, without consulting defendant, and under a misapprehension, removed from defendant's farm all the corn he had and ground it and fed it to stock at the hospital. On his return home the defendant was irritated. He "too, stood in sore need of the corn for livestock feed. He had not intended, and was never

willing, to sell it, and, in fact, had not sold any of his corn for eight years, but had always fed it on his farm.'' Realizing that the conversion of the corn was an inadvertence and that it could not be returned, defendant agreed to settle with the steward at the ceiling price. He also sold the latter some oats. In due time a check came to him from the state which was $3.91 above the ceiling price. Not knowing the weights of the corn he innocently accepted the check. This action resulted. In holding there could be no recovery and in dismissing the suit, Judge Delehant said:

''Precisely what was the legal character of the transaction? With substantial reason, the defendant argues that it was not a sale. Recourse must be had primarily to the statute under which the action is brought for the definition of material terms. 50 U. S. C. A. Appendix, §942, so far as it is material provides: 'As used in this Act—(a) The term ''sale'' includes sales, dispositions, exchanges, leases, and other transfers, and contracts and offers to do any of the foregoing. The terms ''sell'', ''selling'', ''seller'', ''buy'', and ''buyer'', shall be construed accordingly. (b) the term ''price'' means the consideration demanded or received in connection with the sale of a commodity. (c) The term ''commodity'' means commodities, articles, products, and materials * * * .'

''It may be granted that, in application to the singular and essentially admitted factual situation before the court, these definitions are not obviously and clearly instructive. They do, however, lead to the conclusion that the Act, and its implementing regulation, are aimed at (1) a sale, disposition, exchange or transfer, (2) for a forbidden price (3) of a commodity. Even within the sweeping reach of this statutory definition, the existence of a 'thing' susceptible of sale is an indispensable condition to the occurrence of a sale. And invariably to the same effect are the judicial decisions and textual definitions upon the point. Butler v. Thomson, 92 U. S. 412, 414, 415, 23 L. Ed. 684, quoting Blackstone, Kent, Benjamin and Atkinson; Ratigan v. United States, 9 Cir., 88 F. 2d 919, 921, certiorari denied 301 U. S. 705, 57 S. Ct. 938, 81 L. Ed. 1359, rehearing denied 302 U. S. 774, 58 S. Ct. 52, 82 L. Ed. 600; City

of Iola v. Lederer, 86 Kan. 347, 120 P. 354, 356; Burkhardt v. Decker, 221 Mo. App. 1066, 295 S. W. 838, 840; Logan v. Stephens County, Tex. Civ. App., 81 S. W. 109, 110; Heroy v. Reilly, 84 N. J. 671, 87 A. 112, 114, in which the court distinguishing between a 'sale' and a 'relinquishment', says quite significantly: 'A sale involves a transfer of something that may still exist after the transfer'; 23 R. C. L. 1243, Title, 'Sales', Section 61; 55 C. J. 62, Title, 'Sales', §24.

"Now, when the defendant first discovered the removal of his corn, and unquestionably, when he approached Maltman about its taking, no salable commodity remained in existence. The defendant did not then own any corn which he could sell to the state of Nebraska or anyone else. Nor was there any corn which he could replevin or otherwise recapture.

"He did, indeed, own something in respect of which he might negotiate. However, it was not corn or any other commodity, but rather a chose in action against the institution or the individuals acting for it, or both, for the wrongful, though formally innocent, trespass upon his property and conversion and complete destruction of his corn. In Nebraska it has been determined that a taking and destruction of chattel property, after the fashion of the institution's action, constitute a conversion of the property, even though the taker acts in good faith. Stough v. Stefani, 19 Neb. 468, 470, 27 N. W. 445; Hill v. Campbell Commission Co., 54 Neb. 59, 62, 74 N. W. 388. The conversion having already become complete and irretraceable, all that remained to the defendant was his claim for damages on its account.

"So, when he had finished his discussion and arrived at the measure of his reimbursement, irrespective of the language in which the negotiations may have proceeded, all the defendant had done, or could have done so far as the corn transaction extended, was to accomplish a settlement of his claim against those who had taken it. The court, therefore, holds that there was never a sale of the corn by the defendant."

In Zemel v. Commercial Warehouses, 132 N. J. Law 341, 342, 40 A. 2d 642, 643, decided January 4, 1945, the plaintiff, a retailer of denatured alcohol, sued the defendant for the

wrongful conversion of a number of drums of alcohol which were in storage with it. In affirming a judgment of the supreme court, which had reversed a judgment of the district court adverse to plaintiff, the Court of Errors and Appeal, in a unanimous decision, said: .

"The conversion was of six drums of denatured alcohol and occurred on January 27th, 1943. There was some wavering evidence on the part of the defendant that at *about* that time, although alcohol was scarce and there was no free market, there was nevertheless a *little* to be had. The District Court, however, made no finding that alcohol was to be had in the wholesale market, and it is clear that plaintiff made diligent inquiry and was unable to find any. The case turns, not upon the procurability vel non of alcohol in the wholesale market, but upon whether plaintiff, being a retail dealer, was to be held to the OPA ceiling price from wholesalers to retailers of 87 cents a gallon or could recover at the rate of $1.40 a gallon which was the prevailing price in the only market where alcohol was to be had, namely, the retail sales market. The District Court considered that recovery was limited by our cases to the price of 87 cents; the Supreme Court held that the damages should be assessed at the rate of $1.40 a gallon so that the plaintiff might be compensated for the sales that he had lost at that figure.

"We are of the opinion that the value should be computed at $1.40 a gallon but not upon the theory of either lost sales or lost profits, the former of which, in this instance, appears to involve the latter. We find no reason for varying the recovery from the normal measure of damages stated above. Our view is that, without regard to profits, the recoverable value of the alcohol, which was a standardized commercial article, was the price at which it could be replaced in the market, market meaning, in this connection, that phase of commercial activity in which articles are bought and sold. To which of course should be added, as was added, and about which as a recoverable element there is no dispute, the item of interest. It is a meaningless use of formula to say, as appellant contends, that the measure of recovery was the value in the wholesale market

when there was no such market. The OPA ceiling prices were not promulgated to protect one who converts another's property from making the owner whole in accordance with the established rule of recovery."

See, also, Fugate v. State, Okla. Cr., 158 P. 2d 177, in which the accused was charged with larceny of an automobile wheel, tire, tube, etc. The question was whether the crime was grand or petit larceny. This depended on whether the value of the articles was more or less than $20. If the measure of value was the reasonable market value, the worth of articles exceeded $20, but if the measure was the OPA ceiling price, it was less. The court held that the proper measure was the reasonable market value of the articles. There may be commodities on which the OPA ceiling price and the reasonable market value are the same but this is not such a case. The record shows that the truck was not replaceable at the OPA ceiling.

The judgment of the district court is affirmed.—Affirmed.

MILLER, C. J., and OLIVER, GARFIELD, WENNERSTRUM, MANTZ, SMITH, and MULRONEY, JJ., concur.

HALE, J., not sitting.