## Louisville & N. R. Co. v. Blanton.

February 28, 1947.

James S. Forester, Judge.

128

C. S. Landrum, C. E. Rice, Jr., H. L. Bryant and J. C. Baker for appellant.

G. E. Reams for appellee.

OPINION OF THE COURT BY JUDGE LATIMER—Affirming.

Joe Dunreath Blanton, driving a taxicab in the employ of his mother, Sudie Blanton, delivered a passenger to the camp of the Three Point Coal Company in Harlan County. On the return trip to the City of Harlan sometime between the hours of 1:00 and 2:00 o'clock P. M. on Saturday, December 15, 1945, while attempting to cross appellant's railroad tracks at a grade crossing, the taxicab was struck by an engine hauling nine cars loaded with coal. The driver was uninjured, but the taxicab was practically destroyed. The cars were coupled to the front end of the engine, thus the engine itself was backing although pulling the load. Blanton testified that he stopped the taxicab, looked and listened; that he neither saw nor heard the approaching train; that he then proceeded upon the crossing. When the front wheels of the cab were on the track he first heard the train whistle, but it was so close that he concluded he could not negotiate the crossing by continuing in a forward direction; that he thereupon applied the brakes, reversed the gears, and

attempted to back, but, because he was attempting to back up a slight grade on which snow had fallen, he was unable to free his car from the danger. Sudie Blanton instituted this action against appellant to recover damages for the destruction of the car, and for the loss of its use in taxi service for the period of time she alleged she was unable (because of the peculiar market condition created by the war) to procure another to take its place in the taxicab service. Judgment was entered upon a verdict in appellee's favor in the sum of $900.

Appellant urges reversal upon the grounds that the court erred, (1) in not directing a verdict in its favor at the conclusion of the evidence for the plaintiff and at the conclusion of all the evidence; (2) in erroneously permitting appellee to introduce incompetent evidence in her behalf; and (3) in the giving of Instructions 1 and 2 to the jury.

The chief argument in support of the first contention is that appellant was under no duty to sound a warning of the approach of its train, because the accident occurred at a private and not a public crossing; and since the sole negligence relied on by appellee is the failure of appellant's agent to sound the statutory signals for a public crossing, the Court should have peremptorily instructed the jury to return a verdict in favor of appellant. This theory must be rejected, because we are of the opinion, in considering the testimony and evidence as a whole, the accident occurred at a public crossing. It is true the particular crossing in question was not constructed until 1934, and never had been accepted formally by the County, although previous to that time a public road had been maintained to serve the same territory. A portion of the original road was destroyed when the railroad was built from Harlan to the Three Point Coal Company camp. Thereafter the highway was constructed in its present location. The Railroad Company actually constructed the crossing and a portion of the present highway on its own property, but at the expense of and under an agreement with the Three Point Coal Company. KRS 277.060(2) provides that every railroad company shall, as soon as may be, restore to its former condition any highway upon or across which it has constructed its line, and shall maintain the road in its former condition within the right of way of the rail-

road company. Irrespective of the private agreement between the Railroad Company and the Coal Company (and which incidentally never was executed by the latter), we can not escape the conclusion that the present highway was located and was built pursuant to the provisions of the Statute above referred to. It was shown by uncontradicted evidence that Harlan County has built and maintained a bridge on the road in question, and that the State Highway Commission and Harlan County have maintained the road previous to the change in its location. That appellant itself considered the crossing to be a public one is evidenced by the fact that it maintained a sign on both sides of the crossing at statutory distances therefrom in compliance with KRS 277.160, and, in addition, maintained a whistling post on its railroad line at a point fifty rods distant from the crossing pursuant to the provisions of KRS 277.190.

It is argued next in support of the first contention that, under KRS 281.340, it was the duty of appellee's driver to stop the taxicab at a point not less than ten nor more than thirty feet from the railroad track and not to proceed upon the crossing until he ascertained that no train was approaching. Counsel for appellant in their brief state: "It is very plain, even from the evidence of appellee's chauffeur, that he did not comply with the provisions of that section of the statute." We do not so construe the chauffeur's testimony. He stated emphatically that he made two stops: The first as he approached the crossing "right close to that crossing sign," the second when he heard the train whistle blow, at which time the front wheels of his cab were on the railroad track. But irrespective of the testimony on this point, as will hereinafter be seen, the provisions of KRS 281.340 do not require the driver of a taxicab to stop, look, listen, and ascertain that no train is approaching before he proceeds upon a railroad crossing. KRS 281.340 provides:

"The chauffeur of every motor vehicle used in the common carriage of passengers for hire shall stop the vehicle before crossing at grade the main track of any railroad or interurban electric railway, except where the crossing is a guarded crossing protected by gates or a flag controlled or operated by an employe of the railroad or interurban company. The stop shall be made at not.

less than ten feet nor more than thirty feet from the nearest track to be crossed. After making the stop, the chauffeur shall look carefully in each direction for approaching cars or trains, and shall not start his vehicle until he has ascertained that no cars or trains are approaching in either direction.''

KRS 281.010(3) defines ''common carrier'' to be ''any operator of a motor vehicle for hire in common carriage other than the operator of a taxicab or city bus, except that the operator of a city bus who obtains a certificate under subsection (2) of KRS 281.040 shall thereupon become a common carrier as to that portion of its operation covered by such certificate.'' It is manifest from the evidence that appellee's taxicab was not being used in the common carriage of passengers for hire as defined by the Statutes. But appellant contends that, since the reply did not controvert an allegation contained in the answer to the effect that the taxicab in question was being used in taxi service and in the common carriage of passengers for hire, and (appellee's chauffeur) was driving and operating the vehicle in that service at the time of the accident as agent and employee of the plaintiff,'' appellee was precluded from introducing any evidence in contradiction of the contention that the taxicab at the time of the accident was being operated in the common carriage of passengers for hire, therefore the pleadings invoke the provisions of KRS 281.340, supra. But it will be noted that the allegation contained in the answer specifically sets out the fact that appellee's cab was being used and operated in taxi service at the time of the accident; and, although it might have been engaged in the common carriage of passengers for hire, as such language ordinarily may be construed, nevertheless, since it was a taxicab, so engaged, it comes within the exception to the Statute and not under the provisions thereof.

We pass to the complaint that the Court erroneously permitted appellee to introduce incompetent evidence in her behalf. Joe Blanton, the driver of the automobile at the time of the accident, stated that he was acquainted with the fair market value of automobiles in Harlan at the time of the accident; he was then asked what, in his opinion, was the fair market cash value of the machine in question, and he answered $1500. It is insisted that

this evidence is incompetent, because the word "cash" was used in ascertaining the value he placed on the car in question. Even if it be conceded that the word "cash" should have been eliminated, we are of the opinion that its inclusion was not prejudicial to appellant. Automobiles, taxicabs, and similar properties are purchased for cash or on payments to be made in the future; and invariably such properties may be purchased as cheap, if not cheaper, for cash than they may be when the payments are deferred. Another witness testified that the value of the automobile immediately before the accident was between $1100 and $1200. It is insisted that, because the witness did not fix a definite figure, his testimony was incompetent. We think the bracket used was sufficiently definite to admit the testimony. It is further insisted that the ceiling price on the automobile in question, as fixed by the Office of Price Administration, was $830; that any testimony in excess of this amount was testimony as to the "black market value" instead of the legal marketable value of the property, and the recovery in no event may exceed the ceiling fixed by the Office of Price Administration.

This question heretofore has not been presented to this Court; but we are not without authority to substantiate our conclusion in respect to the question, although the Iowa Supreme Court seems to be the only court of last resort which has passed on the effect of ceiling prices as they may or may not limit the liability of a tort-feasor to answer in damages for his tortious destruction of property upon which a ceiling price had been placed at the time of the act complained of. Ross Produce Co. v. Thompson et al., 236 Iowa 863, 20 N. W. 2d 57. The Emergency Price Control Act of 1942, sec. 1 et seq., 50 U. S. C. A. Appendix sec. 901 et seq., was enacted by the Congress as an attempt to prevent unreasonable inflation, and in this attempt it constitutes a departure from the usual allocation of functions between the State and Federal Governments, but only to the extent necessary "to erect emergency barriers against inflation." The Act necessarily covered specific fields of endeavor and particular commodities within such fields; that being true, by implication it excluded those fields of endeavor and commodities within such fields which were not specifically enumerated therein. Section 942,

in so far as it is material to the question under consideration, provides:

"As used in this Act—(a) The term 'sale' includes sales, dispositions, exchanges, leases, and other transfers, and contracts and offers to do any of the foregoing. The terms 'sell,' 'selling,' 'seller,' 'buy,' and 'buyer,' shall be construed accordingly. (b) The term 'price' means the consideration demanded or received in connection with the sale of a commodity. (c) The term 'commodity' means commodities, articles, products, and materials * * *."

Of course, the Act does not require the owner of any commodity covered thereby to sell the commodity to one who is willing to, and does, offer him the ceiling price therefor. And it is a matter of common knowledge that automobiles, no matter in what condition they may have been, have not been drugs upon the market, even at prices far in excess of those fixed by the Office of Price Administration. Were that not so, in respect to commodities in general, there would have been no necessity for the Congress to have enacted such legislation in an endeavor to curb inflation. But the mere fact that the Office of Price Administration prohibited the sale of a commodity in excess of a stipulated price is not conclusive that that commodity had no greater value to the owner or the public in general than the price fixed; and especially is that true where the commodity is an instrument necessary to the conduct of the owner's livelihood and its retention necessary to the continuance of his business. That being true, if a wrongdoer deprives the owner of the use of such commodity, the former damages the latter, not in the sum that he may have received at a voluntary sale, but in the amount it reasonably was worth to him, to be measured by the standards universally adopted, viz., the difference between the fair marketable value, irrespective of ceiling price, immediately before the accident, and the fair marketable value thereof immediately thereafter; and the fair marketable value to be ascertained by a determination of what one not required to purchase would give and one not required to sell would accept. In Ross Produce Co. v. Thompson, supra, the plaintiff's truck collided with the defendant's automobile on a public highway. The jury fixed liability upon the defendant by reason of his negligence. The

truck, as in this case, was practically destroyed. Damages were sought for the destruction of the truck in the sum of $1200, and for its cargo, which the jury fixed at $317, making $1517 in all. The Office of Price Administration ceiling price of the truck at the time of the accident was $634.55. In rejecting appellants' (defendants' below) contention that the loss of the truck should have been limited to the ceiling price, the Court, in discussing the Emergency Price Control Act, said (236 Iowa 863, 20 N. W. 2d 60):

"Its purposes is to place a ceiling limit in prices in 'sales' of commodities, services, etc., or transactions reasonably within the scope of the term, 'sales.' It was intended to prevent the unrestricted and uncontrolled delivery, or disposal of these commodities, etc., at the highest prices obtainable. Surely it was never enacted to place a ceiling upon recoveries for property losses under insurance policies, or for recoveries for injury to or destruction of property by tort-feasors or other wrongdoers, and thus serve to relieve them of making just compensation for injuries caused by their wrongdoing. These adjustments could never be a serious factor in the battle against inflation. The matter between the parties resulting from the collision of the vehicles is not a voluntary sale of the truck or any other transaction within the purview of the Act, but it is a claim for damages of appellee against appellants for their negligent destruction of its property. It is a chose in action. Before the collision appellee had a truck which was used in its business. It was not for sale. It was almost irreplaceable, as this record shows. Its money value to it was not determined by the 'black market', but by the law of supply and demand, the controlling factor, ordinarily, in the maintenance of market values. After the collision it had made no sale, and had received no price, and had nothing to sell. The measure of damages given to the jury by the court was the correct standard by which to measure the reparation owing by appellants to the appellee."

In the case from which we quote, the writer of the opinion cites many cases which, while not directly in point, are sufficiently analogous to be authority for the position therein taken. We will refer the reader to that opinion for these citations without burdening this opin-

ion with their iteration. Most of them involve cases of conversion or larceny, and it was held that the measure of damages was not to be limited by the ceiling price fixed by the Office of Price Administration. Ross Produce Co. v. Thompson, supra, was cited with approval in the case of Zuanich v. Manufacturers Casualty Co. of Philadelphia, Pa., D. C., 65 F. Supp. 1011, although the facts of that case are not on all fours with those here.' Like reasoning is contained in Tierney v. General Exchange Insurance Corp., D. C., 60 F. Supp. 331; and Sun Insurance Office v. Rupp, D. C., 64 F. Supp. 533. Our research finally concludes with the case of Anstine et al. v. McWilliams et al., 24 Wash. 2d 230, 163 P. 2d 816, which holds that the measure of damages for the conversion of an automobile is the value of the automobile at the time and place of conversion, without regard to Federal regulations fixing ceiling prices on such commodities. We believe the reasoning in the above cases to be sound and the conclusions correct. We therefore conclude that the Emergency Price Control Act of 1942 may not be extended to limit the amount of damages recoverable for the destruction of a commodity, otherwise covered by the Act, against a tort-feasor.

The Chief Price Clerk of the Office of Price Administration for Harlan County testified that the ceiling price of the automobile, without radio or heater, and without a dealer's warranty, was $830; with a heater and radio and without such warranty, $867.40; and with a radio, heater, and warranty, $1075.90. The record is silent as to whether the cab in question was equipped with a heater or a radio; but the entire recovery, including damages for loss of use of the taxi, was only $900, and we are of the opinion the jury, in rendering its verdict, disregarded the valuations placed upon the automobile by the witnesses whose testimony is challenged as being incompetent. Therefore, the testimony, if incompetent, was not prejudicial to appellant; and since the amount of the recovery was well within the limits of the ceiling prices testified to by the Chief Price Clerk of the Office of Price Administration, we are of the opinion the judgment should not be reversed on this account.

The objection to Instruction No. 1 is that the Court assumed that the accident occurred at a public crossing; and it is contended that the evidence is conflicting, and

that the issue as to whether the accident occurred at a public or private crossing should have been submitted to the jury. We are of the opinion the evidence, when taken as a whole, establishes the fact that the crossing in question is a public one.

Appellant further insists that it was improper to give to the jury any instruction which permitted a recovery for the loss of the use of the taxicab growing out of its total destruction. In support of its position it cites the case of Weick v. Dougherty, 139 Ky. 528, 90 S. W. 966, 28 Ky. Law Rep. 930, 3 L. R. A., N. S., 348, and other cases approving the case above. It will be noted that, in the cases cited, damages were sought for the loss of profits or anticipated profits and not for the loss of use. In the instant case, damages are sought for the loss of the use of the taxicab. Numerous cases may be cited that recovery may be had for the loss of use. See Chesapeake & O. R. Co. v. Boren, 202 Ky. 348, 259 S. W. 711; Towles v. Perkins, 266 Ky. 25, 98 S. W. 2d 27. Appellant indirectly recognizes the rule under the cases last cited above, and insists that that rule is reasonable when property is negligently damaged, but that in the instant case there is no such reasonable basis, since the taxicab was completely destroyed. A sufficient answer to that contention may be found in Louisville & I. R. Co. v. Schuester, 183 Ky. 504, 209 S. W. 542, 4 A. L. R. 1344. We can not agree with appellant in this contention.

Wherefore, on the whole, we conclude the judgment should be, and it is, affirmed.