[No. 29617. *En Banc.* November 23, 1945.]

ROBERT W. ANSTINE *et al., Respondents,* v. H. T. MCWILLIAMS *et al., Appellants.*[1]

[1]Reported in 163 P. (2d) 816.

*G. E. Lovell,* for appellants.

*Marcus R. Morton,* for respondents.

BEALS, C. J.—June 17, 1944, Wanda Lee Anstine, her husband, Robert W. Anstine being then on military duty overseas, purchased from the defendant H. T. McWilliams, who was engaged in the business of automobile financing in Oklahoma City, Oklahoma, a Ford coupe, 1940 model, at the price of $975. Mrs. Anstine received a credit on the purchase price of the car in the sum of $375 as an allowance for a car which she had previously owned, leaving due a balance of $600. In addition, she agreed to pay $17.20 for insurance and $154.40, which was described as a "time price differential" charged for the privilege of paying the balance due in twelve monthly installments.

Mrs. Anstine executed a chattel mortgage on the car to secure payment of the sum of $771.60, the mortgage providing that the car should not be removed from the state of Oklahoma without written consent by the mortgagee.

During the month of August, 1944, Mrs. Anstine drove the car to San Francisco without procuring the mortgagee's written consent, and while in California, under date August 14, 1944, she wrote to Mr. McWilliams' office, stating that she had been suddenly called to California and had left without obtaining permission to remove the car from the state. Her letter concluded: "If you will give me

your written permission I have my Aug. payment to send as soon as I receive an answer."

To this letter she received an undated reply, the envelope postmarked August 21st, sent via air mail, written on paper bearing the heading "Mid-West Finance Co., Automobile Financing," with the name "H. T. McWilliams" printed in the upper lefthand corner. The letter reads as follows:

"Mrs. Wanda Lee Anstine
1155 Octavia
San Francisco 9, Calif.

"Dear Mrs. Anstine:

"We have your letter of the 14th regarding your car payments.

"Your payment is delinquent since August 17th in the amount of $64.30. We suggest that you send this to us via Air Mail in order to keep your contract up to date. As long as you keep your payments up to date and in good standing we are sure you will have no trouble.

"We hope you found your mother much better and that she continues to improve.

"With kindest regards, we are

"Very truly yours,
"Mid West Finance Co.
(signed) "M. Gene Schooler
"M. Gene Schooler"

Both of the letters above mentioned are in the record.

Meanwhile, Mrs. Anstine had left San Francisco for Spokane, Washington, where she received the letter above quoted. The monthly payments due on the chattel mortgage were paid and accepted, but nevertheless, October 2, 1944, Charles F. Hafer, on Mr. McWilliams' behalf, without Mrs. Anstine's knowledge, took possession of the car, advising Mrs. Anstine by mail that the car had been repossessed pursuant to instructions from Mr. McWilliams.

Mr. and Mrs. Anstine thereupon instituted this action against Mr. McWilliams and Mr. and Mrs. Hafer, asking judgment against defendants as for conversion of the automobile.

Plaintiffs in their complaint alleged the facts above stated, that all payments due on account of the purchase of the automobile had been paid prior to October 2nd; that de-

fendants had taken and secreted the car, which was of the value of $975, for which amount, less the balance due on the mortgage, plaintiffs demanded judgment.

By their answer, defendants, after admitting the purchase of the car, denied that its value exceeded the sum of five hundred dollars, and by way of an affirmative defense pleaded that plaintiffs, in violation of their agreement, had removed the car from Oklahoma without mortgagee's written consent, and that their seizure of the car was justified by the facts pleaded.

Plaintiffs having denied the affirmative allegations of defendants' answer, the action was tried to the court, sitting without a jury, and resulted in findings of fact and conclusions of law in plaintiffs' favor, pursuant to which plaintiffs were awarded $450.70, together with their costs.

From this judgment, defendants have appealed, assigning error upon certain findings of fact and conclusions of law, upon the admission in evidence of the letter received by respondents above quoted, upon the entry of judgment against defendants, and upon the entry of judgment for any amount in excess of $127.30.

We shall refer to Mrs. Anstine as respondent and to Mr. McWilliams as appellant.

We shall first discuss appellant's contention that the action should have been dismissed because respondent removed the car from Oklahoma without permission in violation of the terms of the mortgage which she had signed. We have previously stated the evidence upon this phase of the case.

After she had left Oklahoma, respondent, under date August 14th, wrote from California, asking that her action be approved, and stating that she would continue her payments if her request was complied with. In response to a demand from respondent, this letter was produced by appellant. In due time, she received the letter above quoted, written on appellant's letterhead bearing his name and address.

Appellant objected to the admission of the letter in evidence, and assigns error upon its admission, arguing that

no evidence was introduced indicating that M. Gene Schooler, who signed the letter, had any authority to act on appellant's behalf. The mortgage which respondent signed bears the signature of M. G. Schooler as a witness.

Respondent acted upon the letter which she received, and kept her contract in good financial standing by making the payments called for, which payments were accepted and retained by appellant.

Appellant's counsel contends that, before the letter signed by Mr. Schooler was admissible in evidence, the respondent was required to introduce some testimony showing his authority to make the statements contained in the letter and to sign it on appellant's behalf. There was no evidence whatever as to any lack of authority on the part of Mr. Schooler to sign the letter, and respondent argues that, upon the record as made, the letter was properly admissible, and that the burden then rested upon appellant to show, if he could, that Mr. Schooler lacked such authority.

As above stated, Mr. Schooler signed the mortgage which is an exhibit in the case as one of the witnesses. The letter to respondent bears appellant's name as part of the printed letterhead on which the letter was written. The letter was mailed August 21st and refers to the receipt of respondent's letter dated August 14th, which letter is also in evidence.

 The trial court did not err in admitting the letter in question as part of respondent's case. Our holding is supported by the following authorities:

In 1 Mechem on Agency 194, § 268, appears the following:

"PRESUMPTIONS BASED UPON ORDINARY COURSE OF CONDUCT—ANSWERING LETTERS, TELEPHONE, etc.—The ordinary conduct of men, and the inherent improbability of the given act occurring if it were not authorized, may also furnish *prima facie* evidence. Thus if I write to a business house concerning a matter of business, and receive in due course a reply to my letter, purporting to be made through a manager, superintendent, or other agent or officer within whose department such a matter would ordinarily lie, a presumption that he so replied with the authority of his principal would arise which would suffice until evidence to the contrary was offered."

In 1 Jones Commentaries on Evidence (2d ed.) 341, § 201, appears the following:

"RECEIPT OF REPLY COMMUNICATION.—With respect to a letter received thus in due course of mail and purporting to come from a person to whom a letter has previously been sent and to be in reply thereto, a presumption of fact is indulged in favor of the genuineness of the signature and the letter is admissible in evidence without further authentication; although, in order to obtain the benefit of this presumption, it must first be proven that a letter was written and mailed, to which the letter offered is an answer. The rule that the genuineness of the signature to a reply letter may be assumed applies to a letter signed in typewriting, or by rubber stamp. The majority of the recent cases also support the rule that where a letter sent in the ordinary course of business is answered by an agent of the individual or corporation addressed, authority of such person is presumed and the reply letter is admissible against the alleged principal without preliminary proof of authority. In a few jurisdictions, however, without expressly repudiating the above rule, the decisions tend to the contrary."

In the case of *Bloom v. State Ins. Co.*, 94 Iowa 359, 62 N. W. 810, the supreme court of Iowa said:

"One of these letters, and a most important one, was signed 'W. M. Black, Sec'y, J.' Others were signed 'K. B. Miller, Supt. Loss Dept.' It should be presumed that the letters addressed to the defendant were answered by the proper officers. Surely it ought not to be held, without some evidence rebutting the presumption, that some janitor, floor sweeper, or other subordinate employee, obtained possession of the correspondence, and answered the letters. All of the evidence to which these objections were made was competent, as bearing upon the question of waiver."

The following authorities are also in point upon this question: *Enos v. St. Paul Fire & Marine Ins. Co.*, 4 S. D. 639, 57 N. W. 919, 44 Am. St. 809; *Industrial Rayon Corporation v. Clifton Yarn Mills*, 310 Pa. 322, 165 Atl. 385; *Central of Georgia R. Co. v. Malone*, 165 Ala. 432, 51 So. 730; *Capital City Supply Co. v. Beury*, 69 W. Va. 612, 72 S. E. 657; *Louisville & N. R. Co. v. E. J. O'Brien & Co.*, 168 Ky. 403, 182 S. W. 227, Ann. Cas. 1917D, 922.

The trial court correctly ruled that the letter offered by

respondent was admissible in evidence; and, as the letter was nowise impeached by appellant, it stands as competent evidence in the case.

The trial court fixed the value of the automobile at the time and place of conversion in the sum of $875, determining this amount by taking the price respondent paid for the car and deducting one hundred dollars for depreciation. The only evidence in the record concerning the value of the car at the time of the conversion is the following:

"Q. [by respondent's counsel] Is that a standard or a de luxe? A. That is a standard business coupe. Q. And what model or what year? A. 1940. Q. Does that have an eighty-horse-power engine? A. Eighty-five horse-power. Q. Eighty-five horse-power? Can you state what the ceiling price on this car is? A. The ceiling price is $715.00, plus ten dollars for the heater. Q. It has a heater? A. It has a heater. Q. So, the ceiling price would be $725.00? A. $725.00. Q. In your opinion, would this car bring the ceiling price of $725.00 if put up for sale? A. I would be willing to pay $725.00 for the car, yes, sir. Q. In your opinion, is it worth $725.00? A. Yes. Q. All that the ceiling price would allow? A. Yes, all that the ceiling price would allow. Q. Do you know what the blue-book value of this car is, irrespective of ceiling price? MR. LOVELL: I think I will have to object to that, your Honor. The question is, how much is the car worth. They can't possibly sell the car for any more than the ceiling price, the value of the car. Well, I don't know about this ceiling business.

[Argument and discussion of Counsel.]

"MR. MORTON: It regulates the price at which a car may be sold, but it doesn't necessarily regulate what a car is worth. THE COURT: If you recover, what is the measure of damages, the value of the car, is that the ceiling price, or is it the contract price less what has been paid? MR. MORTON: We will contend that it is the contract price less what is due on our mortgage. THE COURT: Less what is due? Well, that is practically what you paid. MR. MORTON: It amounts to a restoration, if the Court will set the amount of the car at $975.00. If not, we will get less than this. MR. LOVELL: I couldn't possibly understand your notion on that, along that line, that couldn't possibly be the measure of damages for a car. MR. MORTON: The car can't sell for more than $725.00 but that doesn't necessarily mean that our damages are confined to that. THE COURT:

I am not expressing my opinion one way or the other. That is a matter of argument. I think if you take my car, I am not bound by a ceiling price when it comes to a value of that car, what it is worth. The ceiling price may be different than the actual value of the car. I don't see what protection that would be to a car owner, for instance, like myself, with a 1941 Studebaker, and somebody came along and took it away from me, and just said that I could only get the ceiling price for it, why, I would be in an awful shape. MR. LOVELL: That is true, you would be in an awful shape, also, under any circumstances, if you lost your car. THE COURT: Well, law is only common sense. Anything more of this witness? What is the blue-book value of the car? You may answer. A. I will have to read it from the blue-book. THE COURT: Regardless of the ceiling price, what would be the fair market value of this car, or the market here in Spokane on October 2nd, 1944? A. The price that we could sell this car for as a dealer, guaranteeing it— THE COURT: Without the ceiling price. A. No, that would still be the ceiling price, the price that an individual can get for a car is different than what a dealer can get for a car. $725.00 is the price that an individual can sell that car for. We could sell that car for $894.00 plus twelve, or $906.00 that we could sell that car on a retail basis. MR. MORTON: (Q) Now, is that the blue-book value? A. That is the blue-book value, that is $715.00. THE COURT: How much? A. Seven hundred fifteen is the wholesale value on that car. In other words, the wholesale value and what they call the as-is ceiling price, is the same on this particular car. Some cars it isn't, but this particular car, it is. MR. MORTON: (Q) What was the blue-book value on June 17th, 1944? A. June 17th? Q. That same year? A. June 17th was before the ceiling. Q. About three and a half months before? A. June 17th was before the price ceiling was in. It would have a little higher value because the price ceiling reduced the selling price of the car somewhat when it went in on July 10th, I believe. THE COURT: July 10th, somewhere around there? MR. LOVELL: And, of course, if there hadn't been any Pearl Harbor, the price might have been even bigger than that. MR. MORTON: (Q) Mr. Hume, you are willing to pay $725.00 cash for this car? A. Yes. MR. MORTON: That is all. MR. LOVELL: That is all."

It was conceded that the witness who gave the foregoing testimony was competent to testify as to the value of the

238

car, and the foregoing is all the testimony in the record upon that point. It clearly appears from the foregoing that respondent's counsel contended recovery in the action was not limited to the "ceiling price" fixed by the Federal office of price administration pursuant to authority conferred by the Federal emergency price control act, 56 Stat. 23, 50 U. S. C. A. (App.) § 901 *et seq.* The purpose of this act is declared in § 1 (a) of the statute.

It is evident from the foregoing quotation from the testimony and from the findings and judgment entered that the court was of the opinion that respondent's recovery was not limited to or by the ceiling price. The court propounded to the witness a question which if answered might have afforded a basis for the judgment rendered, but the witness did not answer the question.

■ The court having correctly found that appellant had wrongfully converted respondent's automobile, respondent was entitled to judgment based upon the value of the property converted at the time of the conversion.

■ The Federal regulation fixing a ceiling price on used automobiles has no application to such a situation as that presented in the case at bar. *In re Freeman,* 49 F. Supp. 163; *Brown, Adm'r, v. Texas Liquor Control Board,* 54 F. Supp. 350; *Fugate v. State* (Okla. Crim.), 158 P. (2d) 177; *Tierney v. General Exchange Ins. Corp.,* 60 F. Supp. 331.

Many of the authorities, including opinions of this court, use the phrase "market value" as the measure of damages in an action for conversion. This phrase was, however, used in consideration of a free market and not a market controlled by governmental regulations. Property may have no market value because its sale is forbidden, but in case such property is converted, the owner may, nevertheless, recover its value. *Burleson v. Bundy,* 198 N. Y. Supp. 904.

■ ■ Respondent, then, was entitled to judgment against appellants for the value of the automobile at the time and place of conversion, that value to be determined by the court upon the evidence in the case without regard to Federal regulations fixing ceiling prices on used automoblies.

The court, however, could not go beyond the evidence in the record in fixing the value of the car, and appellants' contention, that the record does not support the court's finding that the value of the automobile at the time and place of conversion was $875 is not supported by the evidence, is well taken.

Evidence introduced by respondent that she paid appellant $975 for the car was properly received, as the purchase price, if not too far removed in point of time, may be shown in such a case as this as tending to prove value at the time of conversion. Such evidence, however, standing alone, is not sufficient to support a judgment fixing a present value.

As stated by the supreme court of New Jersey in the case of *Lebkeucher v. Pennsylvania R. Co.*, 97 N. J. L. 112, 116 Atl. 323, in an action against a bailee for loss of property received:

"While the measure of damages was not the original cost but the market value of the lost articles, yet original cost is an element to be considered with others in ascertaining the market value at the time of loss."

The cases of *Schall v. Northland Motor Car Co.*, 123 Minn. 214, 143 N. W. 357; and *Hawver v. Bell*, 141 N. Y. 140, 36 N. E. 6, are to the same effect.

The only evidence which respondent introduced as to the value of the automobile at the time of conversion was that of the witness above quoted, who was admittedly competent to testify as to the value of the car. This witness, after testifying that he would be willing to pay $725 for the car, answered affirmatively the question, "In your opinion, is it worth $725?"

Respondent testified that at the time of the conversion the generator needed repairs, and that the car could not be operated until the repairs were made. In this connection, respondent testified that she did not know how much the needed repairs would cost.

The trial court, as above stated, found that the value of the automobile at the time of conversion was $875, from which amount the court found that there should be deducted for depreciation the sum of one hundred dollars, which

finding, as is the court's finding of the value of the car, is without support in the evidence.

The court erred in finding that the value of the automobile at the time and place of conversion was in excess of $725. The finding that the automobile was of the value of $725 is supported by the record, and the court should have found that amount as the value of the car.

▮ In arriving at the amount of the mortgage lien on the car in appellant's favor to be deducted from the value of the car, the trial court excluded from the face value of the lien, which amounted to $424.30, the sum of $154.40, which amount respondent obligated herself to pay for the privilege of paying for the car in monthly installments.

Appellant contends that the trial court erred in deducting this amount. The trial court's ruling upon this phase of the case was correct, since, appellant having wrongfully repossessed the car, the consideration for respondent's agreement to pay $154.40 for the privilege of paying for the car in installments failed. This sum is not properly due from respondent, and the trial court properly excluded that amount from appellant's lien.

The judgment will be modified by reducing the amount thereof to the sum of $300.70, and, as modified, the judgment will stand affirmed.

MILLARD, STEINERT, ROBINSON, SIMPSON, JEFFERS, and GRADY, JJ., concur.

MALLERY and BLAKE, JJ., concur in the result.