# WALTER KOPISCHKE v. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY.[1]

January 6, 1950.

No. 35,010.

*Alfred E. Rietz, George H. Henke, Robert J. Sheran,* and *Lowell Hastings,* for appellant.

*Regan & Regan* and *H. Clifton Kroon,* for respondent.

MAGNEY, JUSTICE.

Plaintiff's truck was damaged in a railroad crossing accident. There was a verdict for plaintiff. Defendant appeals from an order denying its alternative motion for judgment or a new trial.

---

[1]Reported in 40 N. W. (2d) 834.

Plaintiff is the owner of a farm which adjoins defendant's right of way to the west on the southerly outskirts of Lake Crystal. The farm is reached over a private road from the east which crosses defendant's tracks. These run north and south. On November 15, 1947, at about 5 or 5:30 p.m., Laverne Kopischke, son of plaintiff, was operating plaintiff's two-ton Ford truck west over and on this crossing. It was struck by a northbound freight train.

Laverne was returning from Lake Crystal, where he had purchased groceries for plaintiff's household. When he reached the crossing it was dark and, in his words, snowing "big flakes." He approached the tracks, stopped, and started across. There was an upgrade on the road from the crossing toward the west. At 8 feet from the track the grade was 3/10 of a foot (about 3.6 inches) above the rail, or a 4.5 percent grade. At 25 feet it was 1.1 feet or an average grade of 4.4 percent. A plank parallel with the rail had been placed against each rail on the inner side. Between these two planks there was an open or unplanked space. There was also a plank on the outside of each rail. As Laverne proceeded across the track, the rear wheels settled down into a hole between the two inside planks. He testified:

"* * * As I got into that, I sunk down a little which made it hard to go forward or backward."

He also said:

"* * * The amount of snow that had fallen spun the wheels and made it slippery from the ice on the tires in that hole. * * *

* * * * *

"* * * I kept backing up a couple feet and going forward. So I was sitting there trying to get out and I happened to look to the south and saw a small light which I knew right away was a train."

On cross-examination he described the situation as follows:

"* * * There is a hole and she dropped down in there and I wasn't going at a high enough speed to get over. It stopped there and the wheels spun on the snow. It formed ice and was slippery so I couldn't get up over the hump."

Laverne said the snow was wet but that the driveway was not slippery. The light which he saw down the track became larger and larger. He left the truck, ran up to the house, 225 to 250 feet away, and told his brother to get a tractor to pull the truck off the track. He asked his wife to get a flashlight and see if she could stop the train. He then ran back to the truck and "kept wiggling the truck" and tried to get it out. He kept blinking the clearance lights, the stop light, and the taillights. He said the lights of the train were back two or three blocks, were shining on the truck, "and it [the truck] was setting right in the tracks." The train was coming closer. He waved to his brother not to come any farther with the tractor, and he himself jumped out of the truck and ran to the west. The impact pivoted the truck around into the ditch on the west side, about 10 or 20 feet north of the crossing. The left rear wheel was struck by the front of the locomotive.

On the west side of the track, there is a bank ending about 500 feet to the south, its highest point of 7 feet being about 100 feet south of the crossing and 23 1/2 feet from the center of the track. At 400 feet south of the crossing it is 2 1/2 feet high. Laverne's wife and his sister-in-law, each waving a flashlight, ran along the top of the bank toward the oncoming train. At the point where the locomotive passed them, which was about 280 feet from the crossing, they had stepped down the bank a short distance. As they turned around, they saw the truck very plainly from the lights of the headlight of the engine, which were bright. The engine crew did not see the women or their flashlights.

According to the engineer, he reduced the speed of the train to about 20 miles an hour at the old switch, about 1,250 feet from the crossing, and was still slowing down when he saw the red light of the truck about 400 feet away. He then set the emergency brake. As he approached closer, he saw the truck, but not its headlights. When the engine struck, its speed was about 8 miles an hour. The fireman testified:

"We were slowing down, getting the train ready under control to stop at the town. We got near the old yard switch and I sees

this light, red light, on the back of this truck. It looked to me to be a taillight, the only light that I saw."

He said that they were then about 300 or 400 feet from the crossing; that the engineer saw the light as soon as he did and put air in the emergency and left it in that position until the train stopped. He said that as the train approached the crossing he was looking straight ahead and saw no activity in the Kopischke yard. The track is perfectly straight for three miles to the south, with nothing to obstruct the view. Laverne first saw the train at that distance. From about 250 feet south of the crossing, there is a descending grade to the north. Up to that point, there is an ascending grade to the north.

The truck was equipped with two headlights, a taillight on its left-hand side, and four clearance lights on the box of the truck. In the position the truck was in, the headlights were shining somewhat toward the southwest and, because of the incline, reflected up. The truck was equipped with a gravel box, which extended out some distance from the rear of the frame.

As stated, it was snowing. The visibility by headlight from the engine cab was fair, according to the fireman, but very poor, according to the engineer, who testified that he could see about 400 feet ahead of the engine. The train, which was composed of 15 cars and a caboose, came to a stop with the seventh or tenth car on the crossing.

Because of the questions raised on this appeal, it appears necessary to detail the facts as we have done.

■ Defendant contends that on the evidence it conclusively appears as a matter of law that it was not guilty of negligence. Two charges of negligence were submitted to the jury: (1) Whether defendant was negligent in the maintenance of the crossing, and (2) whether it was negligent in keeping a proper lookout ahead. As to the first, defendant's section foreman testified that he inspected the crossing every day when passing over it on a track motorcar, and sometimes when cleaning it off, and that it was not defective. We have already detailed plaintiff's version of the condition of the

crossing. On this conflicting testimony, a finding by the jury that the crossing was defective cannot be disturbed.

In considering plaintiff's second claim of negligence, that defendant's enginemen failed to keep a proper lookout ahead, we encounter more difficulty. It is undisputed that defendant's track is straight for at least three miles to the south as it approaches this crossing. The truck was on the track during the whole time the train was traversing that distance. Under ordinary weather conditions, it is apparent that the truck could have been seen and its position observed by the enginemen for a long distance, a much greater distance than what would be required to stop the train to avoid a collision. This accident, however, happened after dark and while it was snowing. The headlight on the engine is powerful and shows up objects on the track for a considerable distance when its light has to penetrate darkness only. There is considerable disagreement as to the effect of the falling snow on visibility. The fireman testified that the visibility from the engine cab was fair. The engineer said that it was very poor. Both said that they did not see the truck until within 300 or 400 feet of it, and then all they saw was the red taillight. The women who ran along the embankment to try to stop the train by waving flashlights said that they saw the truck very plainly by the light of the headlight when they turned around as the engine passed them. They were down the track about 280 feet. Laverne said that when he returned to the truck, after having run over to the house, the light of the headlight two or three blocks away was shining on the truck. On this evidence, the jury could find that if the enginemen had kept a proper lookout ahead they could have seen the truck on the track far enough away to have readily stopped the train and avoided a collision at the speed they were traveling, and that consequently defendant was negligent.

Defendant also contends that Laverne, the driver of the truck, whose negligence, if any, under the facts here, would be imputable to plaintiff, was guilty of contributory negligence as a matter of law, and that such negligence was the proximate cause of the ac-

cident. Laverne was not living at home, but at Mankato. At plaintiff's request, he had come home for a day to help with chores and other work while plaintiff was absent on a trip. He was an experienced truck driver. As Laverne approached the crossing he stopped. Because of the low speed at which he was driving, the rear wheels settled into a hole or depression between the rails. He tried in every way to pull out. The truck was not in its stalled position because of engine failure. As the engine was working, it was but natural that Laverne would use every effort to pull the truck out of the hole. He sent his wife and sister-in-law to flag the train with flashlights. He asked his brother to bring a tractor to pull him out. The most serious charge that is made against him is that he failed to put out flares on the track. He was asked, "Were there any flares in the truck?" and he answered, "I believe there was." That is the only testimony in the case relative to flares. It must be remembered that he was home for the day only. He was not a regular operator of the truck. Whether he knew there were flares in the truck at the time he was trying to get it off the track or whether he found it out afterward, the evidence does not disclose. The inquiry was not pursued. In our opinion, the question of his contributory negligence was for the jury.

■ On the question of the measure of damages, the court charged the jury:

"* * * It is the difference in the reasonable market value of the personal property, in this case a truck, immediately before its destruction and the reasonable market value of the same personal property, the truck, immediately after it was destroyed or damaged," and "he is entitled to damage for the loss of use of the truck, * * *."

Defendant challenges the legal correctness of the court's instructions. The truck was practically new. It was first used on August 26, 1947, and was damaged on November 15 following. Plaintiff testified that the market value of the truck immediately prior to the accident was $2,100, and that he was offered $750 for the wreck

immediately afterward. It was not used again until January 22, 1948. Up to the time of the accident, it had earned him $920.98 in clear profit, and at the time of the accident he had a job for the truck as soon as it stopped snowing.

At the close of the testimony, defendant moved for a directed verdict on the ground, among others, that plaintiff had "failed to prove proper measure of damages in that the plaintiff has proved the diminution in the market value of the truck before and after the accident and at the same time has attempted to prove a loss of earnings of the truck following the accident." He also took exception to the court's refusal to give the following requested instruction:

"You are instructed that there is no evidence in this case which would warrant you in allowing plaintiff any amount for the loss of services of the truck damaged in this collision."

Defendant assigns as error the court's refusal to comply with its requests as above. There is no other assignment of error in connection with damages. There is evidence, admittedly not very satisfactory, claiming loss of use of the truck, so it would have been improper for the court to charge that there was no such evidence in the case.

Defendant's contention that the court erred in charging the jury that plaintiff was entitled to recover, if at all, the diminution in the value of the truck immediately before and immediately after the accident plus damages for the loss of the use of the truck calls for a review of the authorities.

The cases that arise concerning damages to personal property are of three types:

(1) Those in which the property is completely destroyed and plaintiff asks for the market value of the property at the time of its destruction; (2) those in which the property is partially destroyed and plaintiff asks for the value of the diminution; and (3) those in which the property is partially destroyed and the property is

susceptible to being substantially restored, and plaintiff asks the reasonable value of the cost of repair.

In Engholm v. Northland Transp. Co. 184 Minn. 349, 353, 238 N. W. 795, 797, where this court gave the general rule of damages applicable to facts such as we have here, it stated:

"The measure of damages to an automobile resulting from a collision is the diminution in the value. Where the car is materially wrecked, such damages are usually established by proving the value of the car before and after. Where such damages to a car are of such a character that the car may be repaired and put in substantially as good a condition as before, the reasonable cost of restoring the car to its former condition is the proper measure of damage. This qualification of the rule however is applicable only to the particular facts of the case which may justify its application."

This latter rule was applied in Waldron v. Page, 191 Minn. 302, 253 N. W. 894, and in Hanson v. Hall, 202 Minn. 381, 279 N. W. 227. In the Engholm case, no question of loss of use arose. In the present case, defendant does not quarrel with the rule that the measure of damages is the diminution in the value of the chattel by the accident at the time of the accident. Its contention is that plaintiff is not entitled to recover, in addition to diminution in market value, for loss of use.

We have in this state also the rule laid down in Keyes v. M. & St. L. Ry. Co. 36 Minn. 290, 294, 30 N. W. 888, 890. In that case plaintiff's team had been injured. Defendant assigned as error the admission of evidence as to the value of the use of the horses of which the owner was deprived during the time they were under treatment. Mr. Justice Mitchell, writing for the court, said:

"* * * Compensation is what the law aims to give in such cases. This is the value of the property if destroyed, and the actual and direct injury in other cases. 2 Sedg. Dam. (7th Ed.) 487. * * *

"In a case like the present the owner is entitled to recover for the diminished market value of the animals *after cure*, so far as a

cure was effected, and, in addition thereto, such expenses as he incurred in reasonable attempts to effect a cure, and a reasonable sum or compensation for the loss of the use of the horses while under treatment, provided the whole damages do not exceed the original value of the property." (Citing cases.) (Italics supplied.)

In Restatement, Torts, § 928, the rule adopted reads as follows:

"Where a person is entitled to a judgment for harm to chattels not amounting to a total destruction in value, the damages include compensation for

"(a) the difference between the value of the chattel before the harm and the value after the harm, or at the plaintiff's election, the reasonable cost of repair or restoration where feasible, with due allowance for any difference between the original value and the value after repairs, and

"(b) the loss of use."

Engholm v. Northland Transp. Co. and Waldron v. Page, *supra*, are in accord with the rule in the first clause of § 928(a) above, and Keyes v. M. & St. L. Ry. Co. *supra*, with the second clause. Thus, a plaintiff bringing his action in this state for the kind of a loss here sustained may adopt either rule as his measure of damages. The result is the same. The nature of the evidence, of course, will vary, depending upon the choice he makes.

In the Keyes case, compensation was allowed for loss of the use of the injured chattels. This is in accord with the rule of § 928 (b) of the Restatement.

If plaintiff under our decisions is entitled to recover the diminished market value of the chattel after repairs and, in addition thereto, such expenses as he incurred in a reasonable attempt to make repairs, plus reasonable compensation for the loss of use of the chattel during the time necessarily required to make the needed repairs, no good reason appears why, when plaintiff is entitled to recover the difference between the market value of the chattel immediately before the harm and immediately after the harm, he is not also entitled to recover reasonable compensation for the loss of

use of the chattel while undergoing repairs. A holding to that effect would be in agreement with the Restatement rule quoted above. In cases like this the law aims at giving compensation. Allowing damages measured by the diminution in value is but partial compensation. Plaintiff also suffered an additional injury in loss of the use of his truck. This harm is not included in a recovery for diminution in value. It is a different and separate injury. By allowing compensation for the loss of the use also, plaintiff is given full and not partial compensation. There is no duplication or overlapping in the two items.

In Raski v. G. N. Ry. Co. 128 Minn. 129, 131, 150 N. W. 618, 619, the court said:

"* * * But the owner cannot have the diminished value immediately after the injury, and also the subsequent expense of treatment and loss of use of the animal. * * * the owner in a case of this kind cannot have both the diminished value, as determined immediately after the injury, and also the expenses of treatment."

The reason for this is clear. A recovery of that kind would be a double recovery for the same loss. The court in that case did not say that permitting recovery for loss of use was improper. It did say that the owner could not recover both the diminished value of the animal immediately after the harm and also the subsequent expense of treatment. Recovery for diminished value and for loss of use contain no element of duplication of recovery. In the instant case, the court did not instruct the jury that plaintiff would be entitled to recover the expense of repair of the truck. Neither was there any evidence offered on that proposition. In our opinion, the court did not err in its instruction covering the measure of damages.

We have already set out defendant's assignments of error with reference to the question of damages. Under those assignments it contends, in the language of the brief, "that plaintiff having relied upon the diminution in the market value of the truck as a measure of general damages could not thereafter collect special damages for the loss of use of the truck." We have determined that if plain-

tiff is entitled to recover for the diminished value of his truck, he is also entitled to recover for the loss of its use. Defendant further contends that plaintiff failed to prove certain elements necessary to support his claim for loss of use. Plaintiff testified that he attempted to find a unit to replace his truck while it was laid up, but was unable to do so. This evidence was offered under the rule laid down in Hanson v. Hall, 202 Minn. 381, 279 N. W. 227. Defendant's objection to this line of questioning was overruled. No further questions on this feature were asked by either counsel. Defendant does not assign as error the overruling of his objection. The alleged error is therefore not before us. Defendant also claims it was essential that plaintiff prove that the time consumed in making repairs was reasonable. Plaintiff said that his truck was laid up from November 15, 1947, to January 22, 1948. Defendant made no objection to this testimony and did not cross-examine on this point, and has not assigned as error the unreasonableness of the period of repair. Accordingly, it is not before us.

3. Finally, defendant contends that under any circumstances the verdict is excessive to the extent of $100. Plaintiff testified that the value of the truck before the accident was $2,100. The jury returned a verdict of $2,200. In support of its contention, defendant quotes from Keyes v. M. & St. L. Ry. Co. 36 Minn. 290, 294, 30 N. W. 888, 890, *supra,* wherein the court as dictum stated: "provided the whole damages do not exceed the original value of the property." In the instant case, plaintiff unsuccessfully attempted to find a unit to replace his truck while it was laid up. To limit recovery under facts such as here to the market value of the truck at the time of the damage would in many instances be a denial of full compensation for the owner's loss. In Restatement, Torts, § 928, heretofore quoted, no ceiling is placed on the amount of recovery under the rules of damages discussed in this case. Some late cases follow the view we have stated. Among them are Community Public Service Co. v. Gray (Tex. Civ. App.) 107 S. W. (2d) 495; Adam v. English (La. App.) 21 So. (2d) 633; Louisville & N. R. Co. v. Blanton, 304 Ky. 127, 200 S. W. (2d) 133; see, also, Doolittle v.

Otis Elev. Co. 98 Conn. 248, 118 A. 818; Hawkins v. Garford Trucking Co. Inc. 96 Conn. 337, 114 A. 94.

Order affirmed.